Good morning, Your Honor. May it please the Court, Counsel, Matt Calvinson for the defendant. Now, you've asked us to be prepared to address the applicability of the McCord case in a minute order from the Court. And I'd like to start with our primary reason for why that case does not apply, and that's that plaintiff's evidence was insufficient to show that he was substantially limited in his performance of any major life activity. So our argument is that there were essentially two legal theories that were put before the jury. One was that he was substantially limited in his ability to work. The second was that he had a substantial limitation in his ability to interact with others. And we believe there was no evidence to support either legal theory. So you're not saying that – but let's just say hypothetically that if I were not to agree with you, and I believe that there is insufficient evidence to support the major life activity of work, but not the major life activity of inability to, you know, to communicate, would then McCord apply, if I disagree with you on the evidence on that point? I don't think so, Your Honor. We think this is a case that is akin to the Portland Feminist case that we cited to the Court, that states when there are different legal theories in play, and we have a general verdict form, and we can't tell which grounds, which way the jury – You didn't ask for a special verdict. No, I'm saying if – we did not ask for a special verdict. I'm sorry, if I misspoke. So you're saying – but if there's just – if it's how we look at the facts, but he only really – you know, I don't see the – I don't see Mr. Weaving as having anything other than one theory, that he has ADHD and it affects his ability to communicate with others. He didn't say that he can't work at all, but that's a major life activity. And so what other – what else was there? Well, I agree with you that that – that he did not say he couldn't work, but that is a theory that he pressed before the jury. And we did argue with the Court about this. We specifically objected to the jury instruction, including work. Well, you didn't, but initially you offered it. And then when you didn't – when the judge wouldn't grant you judgment as a matter of law, then you said, well, we don't want it on work, right? Wasn't that it? I'm not sure I thought – Well, there was something – the burden to show that you can't work at all is a lot harder than it is to show that you can't communicate, right? Yes, Your Honor. And so when – I guess I'm talking about the instruction on working. You initially proffered that because it's a better – it's a more – it's better for you. But then when the judge wouldn't give you as a matter of law, find in favor of that he could work, say that he could work, then you said, I don't want this instruction at all, right? And the Court said, well, it's a correct statement of the law, so I'm going to give it. I – we – what we objected to was the definition of major life activity to include work. After we moved for a judgment as a matter of law and it was denied, we proffered an additional instruction that defined for the jury what it means to be substantially limited in that fashion. But I don't believe we ever retracted our objection. In fact, we accepted after the jury was instructed, again, this idea that he should have included work in the definition of major life activity. So we've never took that away from the jury. I wonder if we could go on to how we draw the line between somebody who is a, you know, a jerk basically, abuses his coworkers, abuses other people, and someone who's got a disability. How do we – can you fire somebody who is just rude and, you know, abusive to his subordinates? I believe you can. And I think that is really the issue that is at play in this case, because we believe there was really no evidence on work. And this is really about what Your Honor just stated. And how – Well, but – Well, what's your answer? Let me just hear what you're answering. Okay. Our answer is we cited to the Court a case out of the Second Circuit, the Jacques v. DiMarzio case, which goes into this issue in a little more detail than this Court did in the McAlladin case. And what it does is it draws a distinction between interacting with others and getting along with others. And we believe this is consistent with the two Ninth Circuit cases that describe this major life activity. So we have the McAlladin case that states, and they're citing from an EOC enforcement guideline, that the legal definition of interacting with others is the relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary. And then the McAlladin case goes on to say, if you're merely cantankerous, that's not good enough, you have to be hostile. And so other courts have looked at that and said, you know, that doesn't really provide sufficient guidance to litigants and employers and trial court judges. And we don't think this is – they state it's inconsistent with McAlladin, but I don't believe it is. I think it is consistent with what the Court was saying in McAlladin, which is there is a difference between interacting with others, which is more mechanical, which is more mechanical of a characteristic that somebody might have, which is the facts of McAlladin. This was somebody who was – had panic attacks and anxiety attacks and was homebound. Where does Mr. Weaving have? He has ADHD, which – and this is looking at the evidence in the light most favorable to him, as we're required to. He has ADHD, which affects his communication style, which was off-putting to some people and not others. Suppose he swears at him. How about that? Would that be – would we be allowed to fire him? I believe we would be. I think it depends on – What if he had Tourette's and part of his Tourette's were that occasionally swear words popped out? I think we're getting closer to the line of inability to interact. And here's – and this is the important reason for that. If you look at the evidence that plaintiffs put into the record, plaintiffs never stated that he had this severe problem that caused a failure to communicate. We see – we see evaluations from his supervisors saying that he's an excellent police officer and he has no citizen complaints, and he personally, his supervisor, has never observed any communication problems. Well, but okay. Here's my problem. You went to jury, okay? So – and you went to jury, and I believe the evidence is basically not disputed on the fact that he has ADHD. I believe that your city doctor also said that, right? That's correct. For appeal, we do not dispute that. And so that evidence was before the jury, and all the doctors said that ADHD, that there is a nexus between that and an inability to communicate. Well, I don't believe he said that, Your Honor. I said occasionally he's impulsive in his communication. Not in the doctors, but is there evidence before the jury where they can make a nexus between ADHD, is there evidence before the jury, and impulsive not being able to communicate well? I mean, it appears to me that there is evidence in the record. Okay, we're talking about this is a jury trial, all right? And then he – so you have that before. Your theory of the case is that he's basically a jerk and that he could control his behavior and he doesn't, and therefore he should be fired, and that's basically what you did. And the law says if someone's, you know, if basically a person doesn't adhere to certain levels of conduct, that's fine. But if, in fact, but there was evidence that makes a nexus between the disability and that that's a behavior that's manifested, and it was his theory of the case that that's why he was acting that way and that you should have accommodated him and allowed him to take medication or counseled him in a different way. Why is not this just a classic case of your theory he's just a jerk and it wasn't his disability and you didn't fire him because he's disabled? His theory is I acted this way because I'm disabled and they wouldn't accommodate me. Why can't the jury just make the – you know, how do we overturn the jury verdict? The reason is because of a specific legal definition that governs this particular major life activity. This is a major life activity that courts have struggled with because it's very amorphous, because we get into questions like Judge Silverman just asked, where do we draw the line between being a jerk and being unable to communicate with people? And the evidence here does not show the type of conduct that we've seen in these types of cases. You can't – the evidence that's in the record, and I believe most of it is undisputed. I mean, there's some quibbling about – So essentially to find your way, we have to say as a matter of law, giving him all inferences, that his disability is not the reason for his behavior, right? No. What do we have to say as a matter of law? As a matter of law, his evidence was insufficient to show that he was substantially limited in the major life activity of interacting with others as defined by this court. So there are – we've cited numerous cases from other circuits stating that an inability to get along with some people and not others is not – does not qualify you as disabled. And we do not dispute. I think your argument has to be one that starts out with a concession that not only he has ADHD, which you've conceded for purposes of the cases is now in front of us, but that his behavior is directly linked to ADHD. That's correct. We concede both, Your Honor. And your argument then is, but this behavior is not – I'll use the word severe enough or maybe bad enough to rise to the level of a disability. Based on this particular major life activity, yes, because of the undisputed evidence. And if that's the argument, help me figure out how we can hold for you without overruling our decision in – I'm not sure how to pronounce it – McAllendon. McAllendon. I've troubled myself with that. Because if you read Judge Trott's dissent in McAllendon, I think he would say, well, this is exactly the case I predicted that would come out of the majority opinion in McAllendon. I would agree with that. And I think that's why – So is Judge Trott mistaken in misreading the decision on the panel in which he sat? In a sense, I think he was. And here's why. Okay. And it really comes down to this Second Circuit case that we cited, the Jacques case. That's another one that I'm – maybe Jacques or Jacques. And I think what the Court is saying is, you know, we're talking about two different things here. Although as I read Judge Jacobs' opinion in the Jacques case, he's saying, well, I'm drawing a distinction that the Ninth Circuit doesn't draw. That is to say, Judge Jacobs agrees with Judge Trott as to how the majority has treated this problem. And we're in the Ninth Circuit, and we can't overrule our panel. So without going on bonks. So that's what I think Judge Fletcher is trying to say. How do we distinguish McAllendon as a three-judge panel without overruling it? I do not believe that the Court needs to overrule McAllendon. Well, we can't. And I'm not asking you to. And I understand that you can't. What I'm saying is there is some dicta in McAllendon that talks about this difference between cantankerousness and hostility. And I'm saying that was not really part of the holding. The definition of interact with others is defined by this Court in McAllendon, which we believe is consistent with the Jacques case. We think it's entirely consistent with the Jacques case. I think if we look at the facts of McAllendon, we think that is entirely consistent with what the Second Circuit is saying. The Second Circuit is saying that it has to be more of a – it's something that applies to you, to everybody. It cannot be an inability to get along with some. And if you look at the undisputed record in this case, and the record is pretty short, we put forth evidence that he treated his subordinates – But are you saying that the only way that someone can prevail on an ADHD is that they have to not get along with everyone in the whole world? I'm saying it has to be more of – you can't be evidence that – I mean, that can't be right. I think if you look at the evidence in McAllendon, this person was homebound. He was socially paralyzed. It wasn't something that happened to some people and not others. This is how he treat – in our case, the plaintiff, how he treated his subordinates, not how he treated his supervisors. So we are saying, in some sense, yes, if the reason we fire you is for how you treated a particular group of people, your subordinates, people that you consider to be salad That is not a disability. I'm having a hard time figuring this out. If you're an employer and the employee is abusive to his subordinates, that would not be a disability. I mean, if he was – it depends. But if he is insubordinate and can't be supervised by his superiors, that would be a disability. If it is more of what the Second Circuit called a mechanical problem that he has. Okay. Let's – I mean, I understand if he's catatonic or if he's in a coma or something, that's the easy case. That's a disability. But your distinction is between how he treats his subordinates versus how he treats his superiors? In this case, it is. But the point is – He's a police officer. Suppose he's abusive to people on the street. Where does that fall? I think that would support his case. But in this case, it showed that he wasn't. There were no – I mean, that was part of his case. If he goes around with, you know, tasing people who don't deserve to be tased, he can't be fired? I mean, that's certainly not – I mean, from the defense perspective, we would love to fire somebody for that reason. I didn't hear you. Sorry. I mean, certainly if he's correct on this case, then yes. Then that would be true. Going around tasing people, unless, you know, there was some other exception that applied under the ADA, he would be disabled and, you know, the conduct was – caused him to tase people. But, again, that's not our position. Our position is the opposite. Our position is when there is an impairment that causes you to act in a certain way, and we're seeing that for persons of this appeal, that only seems to impact how he treats people who work for him but not other people. That just doesn't qualify under the definition. It sounds like what you're saying is if he's a jerk, he can be fired. If he's a real big jerk, he can't be fired. Well, that's what Judge Trott, I think, was pointing out in the McAllen case, and I do believe that is a way to really synthesize these other cases that are dealing with the same major life activity. Well, I think I'll try to resolve the conundrum in just terms of how the statute operates. If he's a, quote, real big jerk, that is to say not the behavior and the personality that we see in this case, but someone who is really unable to control really bad antisocial behavior, he may very well be disabled. But then the question is, what's a reasonable accommodation? Correct. It may be in the police officer's situation that there is no reasonable accommodation and he can be fired. But the reasonable accommodation in the statute is designed to handle that problem. And I would agree with you on that. I think that's right. And that is not what we have in this case, and I think the record is clear on that. But is there a reason, I think Mr. Weaving purports that he could take medication and he could be counseled in a way that he could compensate for this, and that the department was unable, was unwilling to even consider accommodations. Would you allow an officer to take medication for ADHD? As a matter of policy for the city, I'm really not. I assume if he were disabled, if the court finds that conduct like this is a disability that affects a major life activity, then it's under an obligation to do what Your Honor just suggested. So whether we would allow it, I mean, we would follow the ADA. If the ADA requires that, then that's what we'll do. So your position is that the ADA doesn't require you under all facts, given him all inferences here, you did not have to accommodate that? Yes, that is our position. He was not, because he was not disabled. I mean, that's the reason. It's not, it has nothing to do with the accommodation. It has to do with his qualifications for the accommodation under the law. But he has a disability. You concede that. I do not concede that. He has an impairment that does not qualify as a disability as defined by this Court in McAllen. It has to affect a major life activity. And I believe I'm over my time, so thank you. Thank you. Thank you, Mr. Compton. Mr. Goldberg. Good afternoon, Your Honors. Jamie Goldberg here for Matthew Weaving. First of all, we respectfully disagree with the City regarding McCord and McGuire. We think that the question of whether there was a work impairment, communication impairment, or interaction impairment, those were factual questions which the City could have avoided by submitting a special verdict form, asking the jury which impairment Mr. Weaving had. Well, would you concede that apparently that, you know, maybe the evidence you know, what evidence was there to support Weaving's claim of substantial impairment of his ability to work as compared to most people in the general population? Because wasn't he able to work very successfully in law enforcement for many years? That is correct, Judge Calhoun. And, in fact, I will first of all acknowledge that the work, the work, the factual theory of work impairment was the weakest of the three. That's a high burden. Excuse me? That's a high burden. Yes. We were going on that with the regarded as claim, because Lieutenant Gorling, in his report, said that Mr. Weaving, then Sergeant Weaving, should not, could not work as a police officer or a police sergeant. That was part of the regarded as theory. I acknowledge that as far as the actual ADHD and which impairments came out of that, that the working is by far the weakest of the three. However, that is a factual question which the city could have avoided by submitting a special verdict for him. Under what circumstances can a police department fire somebody who is abusive to subordinates? Well, Your Honor, I think if it has to do with ADHD and an impairment, if they're a disability, I think the ADA calls for an interaction, interactive process. They could have said, okay, why do you have ADHD? They could have talked to Dr. Monkhuis. They could have taken a look. They talked to whoever they could have talked to. Right. But he still is abusive to people. Well. Do they have to just live with that? They could have tried to accommodate him and see if the abuse continued. Let's suppose, just hypothetically, let's suppose it continues. If it continues, then at that point I think at some point they have to either fire him or find a place for him to work as a detective where he's not having to interact with his coworkers because he had excellent police skills, but he wasn't good interacting with coworkers. And I will also take exception to what's being put here that it was just subordinates. In fact, the record has instances where he had problems with fellow sergeants. Regarding his interaction with supervisors, he didn't have that many interactions with supervisors, but they observed his impairment. Lieutenant Kelly commented in the evaluation that when he was giving feedback to Sergeant Weaving about how he was perceived, Sergeant Weaving is grinding his teeth and talking through his teeth, and Sergeant Weaving isn't getting it. So there was clear evidence within the department. Well, it's not clear from that exchange or the description of that exchange that he's not getting it. It may be simply that he doesn't want to hear it. Well, certainly. Clearly, there's an adverse reaction. He's not enjoying this exchange. But it may be that he's getting it in the sense that he understands what's being said. He just doesn't like it as being said. Well, certainly, Judge Fletcher. And I think if you look at the Beaverton record, if you look at the evidence, the medical evidence, his whole life this person had difficulty really listening to people, really understanding to correct his behavior, not understanding that it was his problem. And he had that problem his whole life. And he had medication as a young child. And as an adult, he got constant feedback. On the other hand, he was getting feedback for what a great police officer he was, because if you had somebody in your family that was murdered or raped, you'd probably want him on the case. However, he did not interact well with his coworkers. Yeah. But I take your correction about the distinction between his behavior toward his superiors and his behavior toward his subordinates. It does appear that he had little or no documented difficulties with his superiors, but he did have difficulties with those who were his equals in rank and his inferiors in rank. But his lack of difficulty with those above him suggests to me that we don't have a sort of complete inability to interact with other people. It is selective. Well, Your Honor, I would put it this way. We had the medical – well, we had Dr. Monkosh testify. And we had him testify about the will that Sergeant Weaving had to muster because he loved police work, the various devices he had to use in order to get by in police work and do a good job. And I would suggest that when he was dealing with supervisors, he could probably muster enough presence to look good to his supervisors, yes. And then when he's dealing with people on his own level or subordinates, he's not as attentive to that. He's not able to rein in his emotions as much. Yeah. Now, I'm not sure whether this is legally relevant, so I'll put this out there. And I'm not sure what the legal relevance is. But it appears to me from your description that that certainly coincides with my reading of the record. It appears to me from that description or that understanding of the record, if he knows the stakes are high enough that he has to behave properly, he will do it. If he doesn't think that the stakes are high enough, that is, he's no longer dealing with a superior, he won't do it. Well, maybe if he'd understood from the outset the stakes were, if you behave this way, you're going to get canned, he would have behaved appropriately towards his equals and maybe even his subordinates. That is to say, he appears to have some ability to control his behavior depending on the stakes. Well, Judge Fletcher, that could be. I will note that it wasn't until he was on administrative leave that he went and sought treatment, he sought help, and he was diagnosed with ADHD. But, look, if this is a matter of Sergeant Weaving just pulling a fast one, that he runs out and gets a diagnosis, that's the kind of argument that was made to the jury. I mean, now the city is acknowledging on appeal that he had ADHD. During the trial, they brought in their own expert who hadn't seen Sergeant Weaving to say that she doubted the ADHD. And the argument during the trial was that this was just a made-up situation so he could escape discipline. And, in fact, months after the diagnosis, months after he notified his superiors that he had a disability, the city is telling the EEOC that they're still considering accommodation. And that's the other aspect of that. Well, it seems to me, okay, the jury trial is a hard thing for someone to overcome when things go. And it seems to me that the, I don't know, the poison arrow tip in their quiver would have to be that the plaintiffs in McAllen are different than this plaintiff, Mr. Weaving, in that the plaintiffs in McAllen were basically unable to go out in public. While it seems like Mr. Weaving was able to engage in normal social interactions to some degree, particularly with supervisors. So if, to me, it did go to the jury and it seems like they argue, you're pointing out sort of their theory of the case was that he just decided, you know, he made this up and he's trying to get out of discipline and all of that. You put on another case that, no, he was first diagnosed as a child and thought for whatever reason that he had outgrown it. But when all of these problems were called to his attention and he's put on admin leave, he thinks, well, maybe not. And then the doctor opines that there's a nexus between how he's behaving and all of that. So it would have to be as a matter of law that McAllen just doesn't, it talks about people that, you know, can't go out of their house, as opposed to Mr. Weaving clearly can't go out of his house. He can do certain functions as a police officer and apparently excels at certain. So, you know, I guess how do you, McAllen is your best case, but he isn't as bad as the plaintiffs in McAllen. So what's your? Well, he's not as bad as the plaintiff in McAllen. He may be closer to the plaintiff in head. But I will suggest that also he's got a track record submitted, and it wasn't evidence, it was Lieutenant Gorling's report and Deputy Chief Skinner's analysis of a track record that goes back years to Beaverton. And, in fact, they commented on when he was a child. So, yes, it's not on the same level as McAllen. And I don't know what kind of rule the court would make as far as we're on the scale to have this. I think you have a medical diagnosis. You have the nexus with the impairment. So, yes, you know, it's a disability. It is hurting his interaction and communication, not in the same sense. But he can't stop himself from acting a certain way. He has no social clue. In fact, the evidence during the trial. That's a pretty dangerous trait to have in a guy who's got a badge and a gun and a taser on his hip. That's definitely true, Your Honor. And I guess I would just point to the fact, again, that he loved police work so much, and this was a testimony, that he was able to muster enough control that he didn't get one citizen complaint. That's right. And when he was around his peers, his fellow sergeants and the officers, and, by the way, he was not a sergeant the whole time we're talking about here. He was a fellow officer for many years that we have on the record. He let down that shield that he has to have out in public as a police officer. He relaxed into his natural state as a human being. And he got complaints and complaints. Well, police departments let you take medication for ADHD and still be a police officer? They will, if they are assured that the medication is not going to cause you either to be drowsy and fall asleep or it's not going to, you know, have you act in a dangerous way out there. They, police departments, you know, have various individuals being human beings who some have certain psychological problems. Like if you're depressed, can you take an antidepressant and still be a police officer, or do they just say you can't take any medication? They do not say that. They allow medication. But, again, they make sure you have to advise the department of what you're taking and assure them, have them understand that it's not going to make you fall asleep behind the wheel. So if, in fact, he had been allowed an opportunity to take medication and they tried a different form of counseling and he still manifested this behavior, it would be a different case? Well, I believe that would get into the category of undue hardship, perhaps, that the city could say, look, we've tried everything with this person. We've tried to accommodate him. Well, you still have to be able to do the job. And if getting along with your fellow officers and getting along with, you  know, your fellow officers and being subordinates, then you could say that they couldn't do the job. Or maybe he couldn't be a sergeant. Maybe he would just have to be a police officer with no supervisory. That's exactly correct, Your Honor. I will also point out in departments that are the size of Hillsborough or larger, there are many spots for people who just do the investigative work, you know, who work on analysis and don't interact with other people. And, again, with the you have many, many people that might be fantastic investigators and be very good on facts, but when they're interacting with other people, they can't cut it. What would stop you from saying, I have my heart set on being a sergeant and I don't want them to take an adverse employment action by putting me in the evidence room or, you know, processing traffic tickets or whatever? Well, I think, Judge Silverman, that would have been the place to go. If that came true, if that was the case that he was on medication and he wasn't changing, then I think the city would have a good argument to say, look, we've tried and maybe we don't have a sergeant spot where you can just analyze crimes and we have to put you in the property room if they could illustrate how this is impacting his being a sergeant. I think they would have at least had a better argument to make if they had given it a shot, but they had months. Let me ask you a question. I'm just sort of nagging. I mean, I kind of feel sorry for the city who they have a guy who is abusive to other people and they have a duty to protect the other people as well as, you know, Mr. Weaving, and they don't want an employee who is causing problems for other people. Maybe Mr. Weaving didn't use racial slurs, but let's just hypothetically, you know, somebody's going around calling people dirty racial names or being a bully or whatever he is. Well, I totally understand, Your Honor, and I think, again, if they can attribute it to this impairment and they can do something about it, fine, but I think there's a danger here. We're using terms like abusive, abusive to subordinates. When we look at the facts of this case, those terms are quite the opposite. But the subordinates filed a grievance against him, didn't they? Well, the subordinate who filed a grievance was upset because he drove into a high school, according to him, without knowing that it was. Right. Well, but... Despite having, I mean, I read the grievance, despite having made significant efforts to find out if it was, he thought he was responding to a request for help. Right. There was nothing that he could find. And then he was beat up on, in his view, by Mr. Weaving, who refused to listen to his story, and Mr. Weaving refusing to say at all that he might have been in trouble for failing to make it more widely known that this was a surveillance area that he shouldn't have come into. Right. So you can't simply say, oh, this is a guy who's mad because he got disciplined for driving into a surveillance area. That's not the story. Well, Judge Fletcher, the other part of that is that this reprimand where he beat up the complaining officer was reviewed by Sergeant Weaving's superiors. He wrote a five-page document which was beating the dead horse. It was reviewed by his superiors before he gave it to the officer, apologized for how long the officer had to wait to, you know, the three weeks before he had to wait to get the discipline. So we're having these terms thrown around about abuse. A lot of it seems to be, you know, Sergeant Weaving's habit of coming to scenes and standing with his arm folded and leaning back. That is beating a dead horse, giving long lecture answers when somebody just wanted a 15-second yes or no. Over and over, he's getting complaints about this. He had no idea of what he was doing to make people feel that way until he got diagnosed. It's hard for me to understand that he had no idea they're telling him this. He's perfectly capable of understanding lots and lots of information. Otherwise, he would not be a good police officer. Something else is going on here. Judge Fletcher, they told him that he made people feel intimidated and they made people feel uncomfortable and people felt like he was arrogant. But nobody pointed out what he was doing to make people feel that way until right before he's on admin leave, when he's finally starting to get feedback, you know, you're doing this and it's making us feel bad. People are giving him specific feedback. You know, as I read the record, it seems to me that he finally sort of confronts what he's been told all this time when it's apparent that he's about to lose his job. But the same information has been in front of him all this time. It's just he doesn't take it seriously until he's about to lose his job. Your Honor, I cannot dispute that. I think that the nature of some disabilities, that's true. People don't, many people aren't willing to confront it until they're in high danger. That is correct. Isn't, though, did the jury hear all of that? I mean, did the city argue that and then you argued otherwise? Did the jury hear all of that, that this was, you know, if it really were true, why did he wait until such and such a time? Certainly, the jury, in fact, the closing arguments of the defense and I think the opening statements and through the trial, the defense was making the point that, you know, from their point of view, Sergeant Weaving had had these troubles on an ongoing basis and then he's on administrative leave and he's being investigated and then he goes and gets this diagnosis. You know, why did he wait to that point when he's really going to be in trouble? And I think the nature of these many disabilities and many human beings are, that's sometimes what it takes. But I think if we're going to say somebody like that can't turn to the ADA for recourse, that's a hard line to draw. Many people who are disabled don't have the wherewithal, the emotional intelligence to go do something before that, especially when they're being promoted, the silver-haired child coming up to the department, they're getting positive feedback, along with this negative feedback. It might take something like all of a sudden they're out of work, they don't know what's going to happen, and now they start saying, wait a minute, maybe it is my problem. That's what it took in this case. Well, so I guess it's just so that I understand your argument and what I understand their argument to be is that as a matter of law, neither of you should have won, and there were factual disputes and the jury believed what you had to say and not what they had to say. Oh, I'm sorry, Your Honor. I didn't quite follow the part where neither one of us should have won, but I didn't know. Well, but they're saying as a matter of law the court should have found in their favor that, I mean, essentially that this isn't McCallaghan, and so that the behavior was such that even giving all the inferences, as a matter of law, they should have won. Right. And you're arguing that these were factual disputes, that the jury was correctly instructed, and their argument that he was Johnny-come-lately to getting his diagnosis and addressing this was all argued to the jury, and that their argument that it was really his personal, you know, it was behavior he could have controlled and chose not to. They didn't buy it. That's right. They bought that he had a disability, and the disability was with a major life function. That's exactly right. If they thought Dr. Moncarch was a quack or they thought that the connection of the impairment to Dr. Moncarch's diagnosis was off base, I think they would have found for the defense in this case. They didn't. They didn't find that. But if this Court were to say that McCallaghan says that the major life activity is limited to say, like, it's not that his, given all inferences as to the worst-case scenario, it doesn't rise to the level of McCallaghan, then as a matter of law they're saying they should win. Yes, and I think that would be drawing a huge line in the ADA protection that isn't there when we talk about disabilities that aren't physical. When we talk the realm of mental disabilities, emotional disabilities, you have a psychiatric diagnosis that was confirmed by the city's people, no interactive process to see what would have helped, and we have a direct linkage to the behaviors, which were not bullying, were not violent, but were problematic. Yes. It caused many people, many people, both in Hillsborough and Beaverton, to not like and not like working around the plaintiff, which there was no ‑‑ which I think would be said for many people with mental, emotional disabilities and maybe even some people with physical disabilities are not sometimes easy to work around. Okay. Is Judge Callahan in here? Thank you, Mr. Gilbert. Thank you. Mr. Cominson. Thank you, Your Honor. Just one clarification. We are acknowledging on appeal that he has ADHD. That's because of the standard of review, so it's not because we've changed our position. I think that we're required to do so, so we are. As to Judge Fletcher's point, I think plaintiffs are minimizing the selectivity of the manifestation of this impairment. It was subordinates. It was some peers. It wasn't other peers. And, again, I think the record is clear on that. I think the record shows that he had friends and allies in the department who agreed with his method of police work. You know, salvezers versus easers. What sort of trust facts do we have to have that ‑‑ does it have to be everyone? I don't think it has to be. I mean, what if you get along with your mom, you know? Right. I mean, does it ‑‑ And I think that wouldn't be good enough. I don't think your theory that it has to be everyone could be right. I think it can't be purposely selective. I think that is what it is. I think it cannot be a case that you don't get along with some people, but you get along with others because it doesn't rise to that standard of what they're talking about in McAlladin and the other cases. I mean, there is ‑‑ Where cantankerousness ends and disability begins is if you can sort of kind of control it, I guess is what you're saying. Correct. I mean, is it a true disability? Is it something that you cannot control? And here we have a situation where it's clear that at least it only affects people who work for him and peers with whom he either doesn't respect or doesn't agree with or who have questioned his judgment in some manner. But the record is clear that he had friends and allies that he got along with, that his supervisors liked him and saw no communication disabilities, and that just does not rise to the level of McAlladin. And I think if you look at McAlladin in light of these other cases that cite approvingly McAlladin, that's what they're saying. They're saying the fact that you are not getting along with some people at school and that's related to your depression isn't enough to substantially limit the major-like activity of work. And then very briefly, if the Court will allow me, just two seconds on the conduct instruction. Judge Silverman mentioned sort of unfairness inherent to employers in a situation like this, because employers do have a duty to their employees, people who are victims of a hostile work environment. So what we have is an instruction, the conduct instruction, that essentially states conduct related to a disability is part of the disability and not a separate grounds for termination. I'm paraphrasing, but something like that. And so what this means is there is no excuse. The city has essentially strict liability if the jury decides that the reason that Mr. Weaving acted this way was because of his impairment. And so there are cases in the Ninth Circuit that state this is an appropriate instruction in most cases. We think this is one of those cases where it's not an appropriate instruction and for two reasons. One is that we didn't know that he had a disability at the time that the conduct was occurring. We already started investigating the hostile work environment complaint, and so we don't think an after-the-fact claim for accommodation means that we can no longer discipline him for things that happened beforehand. And two, we think that this is – falls within the sort of egregious exception to that instruction. Well, okay. So, but you didn't fire him until after – you did – when you fired him, you knew of his diagnosis. That's correct, Your Honor. Yes. So I don't think that's exactly correct of what you're saying. I mean, if you hadn't known of his diagnosis and you fired him, you'd be in a better place, right? Yes. Yes. At the time we fired him, we knew that he had been diagnosed. That's correct, Your Honor. But then we have, you know, can we – can a jury decide that this is one of those cases where you're entitled to fire somebody because you have created a hostile work environment and not because of a disability? Okay. Thank you, Your Honor. Thank you, Robert. This is a very good argument from both counsel. The case does start. You just submit it. The stand is recessed.
judges: Silverman, Fletcher, Callahan